# ALLAN WATSON *v.* STATE.*

## (*Knoxville.* September Term, 1915.)

1. CRIMINAL LAW. Evidence. Opinion. Insanity.

In a criminal case, a hypothetical question intended to elicit opinion evidence as to defendant's' sanity, is incompetent, unless addressed to an expert on insanity. (*Post, pp.* 200-202.)

Case cited and approved: Ashby v. State, 124 Tenn., 684-723.

2. CRIMINAL LAW. Evidence. Insanity. Qualification of expert.

Where a medical practitioner, testifying in a criminal case, admitted that he had read of insanity only in such books as were possessed by the ordinary practitioner, that he had made no special study of mental disease, and did not regard himself as so well posted on insanity as on typhoid fever, pneumonia, and such general diseases, he was not qualified as an expert on the subject. (*Post,' pp.* 200-202.)

3. CRIMINAL LAW. Evidence. Opinion. Insanity. Form of question.

In a prosecution for forgery, where a medical witness was asked the question, "Taking into consideration what you know of defendant's ancestors and his family, and what you know of him personally, and then taking into further consideration the further fact, if it be a fact (stating certain facts assumed to have been shown by the evidence), state whether or not, in your judgment, defendant had a sound mind," such question was improper, and the answer thereto properly excluded, since it called for the witness' opinion, based not only on the facts stated, but also on what the witness knew of the defendant personally, his family and ancestors. (*Post, pp.* 200-202.)

4. CRIMINAL LAW. Intent. Insanity.

Where defendant forged indorsements to a note, having sense enough to know that his act was a violation of law, he was

---

*On weakness of mind as affecting responsibility for criminal act see note in 10 L. R. A. (N. S.), 999.

On measure of proof of insanity in criminal cases see note in 39 L. R.A. 737.

On nonexpert opinion as to sanity see note in 38 L. R. A., 721.

Watson v. State.

punishable, though believing that Providence would intervene to prevent his detection and punishment, yet one so deficient in mind that he has no sense of right or wrong, nor capacity to reason about the quality of his act and no consciousness of wrongdoing, is not guilty of crime in committing a criminal act, since he has no criminal intent. (*Post, pp.* 202-216.)

Cases cited and approved: Johnson v. State, 100 Tenn., 252-259; Commonwealth v. Rogers, 48 Mass., 500; Guiteau's Case, 10 Fed., 161; Reynolds v. United States, 98 U. S., 145.

Cases cited and distinguished: Mahon v. State, 127 Tenn., 535-549; Bond v. State, 129 Tenn., 75; Stuart v. State, 60 Tenn., 177.

5. **FORGERY. Sufficiency of evidence.**

In a prosecution for forging indorsements, evidence *held* sufficient to sustain verdict of guilty. (*Post, pp.* 202-216.)

FROM CAMPBELL.

Appeal from the Criminal and Law Court of Campbell County.—XEN HICKS, Judge.

JAMES A. FOWLER, SILAS ROGERS, E. H. POWERS and AGEE & PETERS, for appellant.

WM. H. SWIGGART, JR., Assistant Attorney-General, for the State.

MR. JUSTICE BUCHANAN delivered the opinion of the Court.

By general verdict of the trial jury Allan Watson was convicted upon an indictment charging forgery

in its first count, and passing a forged note in its second count, and from the judgment of the trial court overruling his motion for a new trial and imposing sentence on him, he has prosecuted an appeal.

The only defense on which he relied below was insanity at the time of the commission of the acts charged against him. He did not testify upon the trial of the cause. He advances here two grounds for reversal of the judgment. One of these is that the court below should have allowed Dr. Morris to answer a question, which was in part as follows:

"Taking into consideration what you know of Allan's ancestors, and the Watson family, and what you know of Allan personally, and then taking into further consideration the further fact, if it be a fact."

Then followed the statement of certain facts assumed by counsel for appellant to have been shown by the evidence, and the question concluded thus:

"Taking all of these matters into consideration, state whether or not in your judgment he has a sound mind."

We think the court was correct in excluding the answer of the witness to this question upon two grounds: First, because the question, in part, at least, was hypothetical, and as to so much of it as was of this character opinion evidence was incompetent, except from an expert on insanity. The examination of the witness clearly disclosed his lack of expert knowledge on that subject. He admitted that he had read of insanity only such books as were

possessed by the ordinary practitioner, and that he did not regard himself as so well posted on insanity as he was about typhoid fever, pneumonia, and such general diseases, and that he had made no special study of mental diseases. In other words, he falls clearly within the rule laid down in *Ashby* v. *State,* 124 Tenn. (16 Cates), 684-723, 139 S. W., 872. The second fatal objection to the question is that, if the answer to it had been admitted, and had been that, in the opinion of the witness, Watson was of unsound mind, the jury would have been wholly at sea in determining whether the opinion was based on the facts detailed in the question hypothetically or on some state of facts existing in the knowledge of the witness, but undisclosed by any evidence in the record, for the inquiry of the witness called for his opinion, based not only on the hypotheses stated in the question, but also on what the witness knew of the defendant personally, and of his family and ancestors. In weighing the probative value of this opinion, the jury would have been unable to determine whether to base it on the hypotheses stated in the question, or some supposed and wholly undisclosed knowledge of the witness. The jury might have concluded that the opinion was wholly valueless, so far as it was based upon a supposed statement of facts, on the ground that, in their opinion, these facts were not shown by the evidence, yet they might erroneously have been led to have accepted and given weight to the opinion upon the idea that the doctor had some good reason for

entertaining it not disclosed by the question, or any of the evidence which he had theretofore given. The rule of law is that questions calling for the opinion of experts—"must be based on facts admitted or established by the evidence, or which, if controverted, the jury might legitimately find on weighing the evidence." Wharton on Criminal Evidence (10th Ed.) vol. 1, sec. 411; 2 Elliott on Evidence, sec. 1116, note 6.

The next and final point made is that the evidence preponderates against the verdict of the jury.

Plaintiff in error is a native of Hardin county, Tennessee; was about thirty years old at the date of his arrest. His offense in this case was committed on January 18, 1915. He was arrested some months thereafter. When about the age of twelve years (his mother having died when he was about two years old, and he in the meantime having resided with his grandfather in Hardin county) he went to live with his father, who had married again and was residing in Chattanooga. His first entry into business life was in the city of Chattanooga. He had several employments there, and moved from that place to Knoxville about six years prior to his arrest. He became interested in religious matters early in life; joined the church in Chattanooga, and, on coming to Knoxville established church connections here, and was quite active in church work. In Knoxville he appears to have conducted a successful insurance business for some time. At the time of his arrest in this cause his insurance business had grown to such an extent

that he was representing several companies. He was regarded as a capable insurance man, and a good business man, and his character for sobriety and morality appears to have been excellent prior to the discovery of certain matters, which will be hereinafter more fully considered.

Some time after coming to Knoxville he became interested in what was known as the "law enforcement movement," and was elected president of the Civic Union, an organization having for its purpose the promotion of law enforcement, and especially the prosecution of violations of the liquor laws. In furtherance of this work a newspaper called The Citizen was published, for which Mr. Watson did most, if not all, of the editorial writing. It resulted that he became quite a conspicuous figure in the law enforcement movement, quite active in matters political, and in the interest of law enforcement he was greatly interested in the personnel of those candidates considered favorable to rigid enforcement of laws. During a good portion of the time of his residence in Knoxville he had also been active in certain charity and church work. All this brought him into contact with many people of all classes, and, among others, with six gentlemen of good position and financial standing, whose names he forged as indorsers to the note set out in the indictment. This note was for the sum of $1,500. It bore date January 18, 1915; was due four months after date, and made payable to the order of the persons whose names were written

on the back of the note. The names of these persons were traced by Mr. Watson on the back of the note from their original signatures, possession of which he had gained in some way. The note was made payable at the National Bank of La Follette. It was signed by Allan Watson, and was purchased by the bank at which it was made payable from Watson, the maker, either on the day of the date of the note, or the next day. It was purchased at the bank's place of business. Prior to this transaction one of Mr. Watson's friends, also a friend of the bank, had, at his instance, written the president of the bank respecting Watson's desire to make such a transaction and the solvency of the proposed indorsement, and had been informed that the bank would take the note. The president of the bank knew of the solvency of the indorsers, and of Mr. Watson's connection with the law and order movement, and was informed by Watson that the money was to be used to further that movement; that he preferred to get the money in La Follette rather than in Knoxville, for the reason that he did not want it known in the latter place that he was using money for the above purpose. Watson's bookkeeper, Miss Adelia Dawn, who was with him in that capacity from February, 1913, until after his arrest, and who was in charge of his office for some time after that event, testified that she remembered the time when he went to La Follette about the note. She said he returned with the $1,500 in cash and turned it over to her, and the substance of her evidence is

that it went into his bank account, and was checked
out by him in his business in the usual way. She said
the expenses of his insurance business were about
$500 per month, and at the time this transaction hap-
pened that he was short in his accounts, with all of
the insurance companies he represented, in the ag-
gregate sum of about $2,800. W. S. McKamey, presi-
dent of the La Follette National Bank, testified that
Watson received from the bank, in currency, only
$1,464 as the proceeds of the sale of the note. After
his arrest Watson told Mr. McKamey that at the
close of the political campaign for sheriff of Knox
county in 1912, he found himself in debt on account
of money he had expended therein, in the sum of
about $3,000. He also told McKamey that he owed
about $15,000 or $16,000 at the time of his arrest. J.
Will Taylor testified that after being arrested Watson
admitted that he had outstanding $14,000 or $15,000
of forged paper, and that he was short with one of
his insurance companies for $500 or more dollars for
premiums collected which he had not remitted. About
the first of the year 1915, and near the time when the
forgeries in the present case were committed, Watson
also forged indorsements on a note made by him for
$2,750, which he sold to the Coal Creek Bank. This
note he negotiated by using the good offices of another
one of his friends in Knoxville, who knew the officers
of the Coal Creek Bank, and who knew of the solvency
of those persons whose names Watson had placed on
the back of the note as indorsers. The aggregate

amount of money secured on that note, and on the one sold to the La Follette National Bank, was more than $4,000, and was more than enough to settle the amount which Miss Dawn states was his arrearage with the insurance companies which he represented; but whether the money so secured was used by him to reduce his debts to the insurance companies to the sum of $500, which he told Mr. Taylor was the amount he owed one of them at the time he was arrested, does not clearly appear. Nor does it clearly appear whether any of the money so secured went directly to further any law enforcement movement. Testifying to this exact point, as to proceeds of the note sold the La Follette National Bank, Miss Dawn says:

"Q. Isn't it a fact that it went out for office rent, for clerk hire, and for money that he was short with these companies? A. If it went out that way, it was because he had used other money in his work. Q. Didn't it go out for office rent, clerk hire, etc.? A. To cover expenses that he had used the money for in that way. Q. And for money that he was short with his companies, isn't that true? A. Yes. Q. How many companies was he short with? A. Well, he was short with all he had in his office at the time he closed out. He had five companies at the time he closed out."

This evidence is somewhat in conflict, as will be observed, with the statement made by Mr. Watson to Mr. Taylor.

This brief review of all that need be stated of the evidence at this point brings us to the real question

in the case. It is stated on the brief of counsel for appellant in these words:

"The whole contention for the defense is that the accused was so wrought up over the law enforcement work that it destroyed his power of discerning right from wrong about anything connected with, or bearing upon that movement, and hence that he was incapable of committing any offense when the act grew out of or was designed to promote that movement, the evidence showing both his physical and mental condition and also the extent to which his mind was thereby absorbed to the exclusion of everything else."

It is well to remark that the foregoing contention must be considered in the light of the rule laid down in one of our cases as follows:

"In this court, the burden is upon the plaintiff in error to show his innocence by a preponderance of the evidence. By the verdict of the jury, approved by the trial judge, the presumption of his innocence has been removed and converted into an adjudication of his guilt. Therefore the inquiry here is not whether he is guilty, and the investigation of the record is not made with that in view. But the question is, Is he innocent? And the record is investigated upon the assumption of his guilt. Immaterial conflicts in the testimony of witnesses are not considered. Discrepancies in dates and distances, which are not controlling in their materiality, are disregarded. In many cases, the mere weight to be given to the testimony of witnesses, arising out of their

number and general reputation, is disregarded because these questions are all deemed to have been settled by the jury and trial judge, who saw them upon the stand." *Mahon* v. *State,* 127 Tenn. (19 Cates), 535-549, 156 S. W., 458, 461.

It is not necessary to review the evidence of all of the witnesses who testified for appellants in respect of his mental condition. One of them, whose evidence most nearly corroborates the insistence above copied from the brief said:

"So far as I could tell in religious matters he was very deeply in earnest and spoke of the good he was trying to do, and that he was in it for the good that there was in it, and when he crossed in opinion with the great majority of his friends he expressed himself at different times to me that it was on account of deep conviction of duty, and that he had to go by his own judgment, that he could not go by anybody else's, and that it was just a matter of his own conscience, that he had to follow out the dictates of his own conscience. He seemed to have an idea that he was in the hands of the Divine Power. I cannot say that he just used the words, 'I am in the hands of the Divine Power,' that is as near the substance as I can give you. If he didn't say that, he used words that meant exactly that, that the hand of the Almighty was upon him, and that it made no difference what he got into, he would come out all right in the end. He seemed to have that settled and positive conviction."

On the question of plaintiff in error's ability to distinguish right from wrong, the last-mentioned witness said:

"If you asked me the question, if he had a sound mind, I would say, no. That is my positive opinion, that he hasn't a sound mind. Now, if you asked me if he is crazy on all subjects, I would say no, he is not crazy on all subjects, but on the things that I have been talking about, from my conversation with Mr. Watson in the office and the way he did, I am of opinion that he was not of sound mind on the things that we have been talking about. If you asked me whether he knew right from wrong at the time of that forgery, I don't think he was able to calculate the results of that forgery at all. He had sense enough to know that it was a violation of the law. He knew that, but he did not have sense enough to know that he would be caught up with. That man didn't have any more sense than to believe that when he forged that note there would be a divine intervention of Providence."

The jury may have given full credit to the evidence of the witness, and, we may add, to that of each of the other witnesses called on behalf of plaintiff in error, and yet have reached the verdict complained of by him. A man may have the deepest religious convictions and be thoroughly persuaded that the hand of the Almighty is upon him, and that whatever he may do will turn out all right in the end, that Providence will intervene to prevent the detection and punishment of any crime he may commit. Yet if he does

133 Tenn. 14

an act which in a man of sound mind would be criminal in character, and at the same time the act is done, to use the exact words of the witness, "he had sense enough to know that it was a violation of the law," for which punishment was prescribed, there is no immunity from punishment for him. The law exacts obedience from him as well as others, and when he knows the act he contemplates to be a violation of the law, for which punishment is prescribed, he has then a legal conception of what is right, and also of what is wrong. In legal contemplation to obey the law is right, to violate it is wrong, and if he choose the latter course, the law implies on his part a criminal intent, and punishment is the result of his violation of its mandate, or its prohibition. Yet the law is tender of the life and liberty of the subject, and if the latter be so deficient in mind from any cause that he has no sense of right and wrong, no capacity to reason about the quality of his act, no consciousness of wrongdoing in the commission thereof, then. the criminal intent· is wanting, and the act is no crime in the eye of the law. Mere ignorance of the law does not of course suffice to rob its violation of criminal character or absolve the delinquent from punishment, for it is wisely held that if he have sense enough to know the difference between right and wrong, it is his duty. to know before he commits the act, and so very early in the development of our jurisprudence was the maxim formulated, "*ignorantia legem neminem excusat*," and to such a violation of the law there is

imputed the evil intent which is necessary as an element in all crime. In one of our latest cases on this subject it was said:

"The inquiry under the plea of insanity was whether the defendant had capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he was then doing—a knowledge and consciousness that the act he was doing was wrong . . . and would subject him to punishment." *Bond* v. *State,* 129 Tenn. (2 Thomp.), 75-83, 165 S. W., 229, 231.

See, also, *Stuart* v. *State,* 60 Tenn. (1 Baxt.), 177-185. In another of our cases, quoting from Archibold, Cr. Proc., it was said:

"The insanity must be of such a kind as entirely to deprive the person of reason as applied to the act in question, and the knowledge that he was doing wrong in committing it. If, though somewhat deranged, he is able to distinguish right from wrong in his own case, and to know that he was doing wrong in the act which he was committing, he is liable to the full punishment of his criminal act."

To the above, the opinion in that case added:

"The capacity to know right from wrong, and to know that the particular act being committed is wrong, is recognized as a correct rule in Tennessee, to test the question of criminal responsibility."

And this rule was approved in *Johnson* v. *State,* 100 Tenn. (16 Pick.), 252-259, 45 S. W., 436. See, also, *Commonwealth* v. *Rogers,* 48 Mass. (7 Metc.), 500,

41 Am. Dec., 458; *Guiteau's Case,* and note (D. C.),
10 Fed., 161; *Reynolds* v. *United States,* 98 U. S., 145,
25 L. Ed., 244; Wharton & Stille, Med. Jur. vol. 1
(5th Ed.), secs. 171, 175, 177, 179, 187. · No witness
called by him, speaking from personal knowledge of
the man, was bold enough to express the opinion that
Mr. Watson did not know it was a wrong punishable
by law to commit forgery at the date of the act in
question. Indeed, it is difficult to understand how any
one could entertain such an opinion in the face of the
most prominent and undisputed facts in the case, to
wit: That Mr. Watson's daily life was in large part
a battle against violations of the law, and a protest
against the failures of the constituted authorities to
inflict punishment upon offenders. His intelligence,
the acuteness of his intellect, and his capacity to con-
ceal a chain of forgeries, extending from 1912 until
1915; on these and other undisputed facts of the
record, the jury may well have concluded that the
defense of insanity was a forlorn hope, advanced be-
cause no other was possible under the facts.

It is urged that insanity was in the Watson blood;
that his mother was a consumptive; that Watson him-
self was a scrofulitic, a man of poor health, an en-
thusiast, a badly balanced man. All this may be true,
and yet it does not follow that he did not know that
forgery was a crime for which the law inflicted pun-
ishment when he committed the act in question.

Aside from the defendant's evidence, which we have
considered, there is ample evidence of entirely

credible character in the transcript tending to show that at the time of the commission of this act Mr. Watson was sane. Eight witnesses testified to this effect, on behalf of the State, basing their respective opinions on their acquaintance with, and observation of, the man, and in view of this evidence the jury may very well have concluded that the crime in question was due to none of the causes relied on by the defense. The primary motive for the crime appears to have been a dire need of immediate funds with which to liquidate certain arrearages to the insurance companies he was representing. Looking back, however, for an explanation of that which created this indebtedness, it appears to be found in some personal peculiarities of the plaintiff in error. Among his most marked characteristics was a vast confidence in the correctness of his own judgment. This, as the result showed, was not always well placed. For illustration, in the selection of a candidate for sheriff in 1912, for which the law and order faction was to vote, a meeting was held, and a vote of the leaders of that faction taken. The vote stood 113 to 3. Mr. Watson was one of the minority. The weight of this vast majority of the leaders of his faction did not, however, have the effect to change his views. He continued to stand for his candidate, and it was at the close of this election that he found himself short about $3,000, and this was the beginning of the double life which he subsequently led in Knoxville. After his arrest he told Mr. McKamey that he began forging paper in

1912, at the close of this sheriff's race, in order to meet this $3,000 shortage. A complete history of his forgeries does not appear in the record, but it is clearly shown that nothing was known of them during these three years until a very short time before his arrest, when his total indebtedness was between $15,000 and $16,000. Just what part of this was taken care of by forgeries, and just what part by genuine indorsements, does not clearly appear. It is argued that this course of conduct is in itself an evidence of unsound mind, but, on the other hand, the jury may have considered it, in the light of all the evidence, only an indication of a very obstinate and self-willed character. This latter view is strengthened by a circumstance now to be related. There is evidence tending to show that Mr. Watson's original plan in respect of the note which he sold to the La Follette National Bank was to get the genuine indorsements of the six gentlemen whose names appeared on the back of that note. But in this he failed. Whereupon he forged their indorsements, tracing them upon the note from genuine signatures in his possession, so that the traced signatures closely resembled the genuine. This, on the one hand, may be said to indicate insanity, yet, on the other hand, pride of opinion, self-will, and determination to have his own way about the matter. Again it is in evidence that quite early in his business career, when he was confidential man and stenographer for Mr. Loupe, superintendent of the Southern Express Company, at Chattanooga, Mr.

Watson desired to secure for one of his friends a position as an employee of the company. He knew of a vacancy which he desired his friend to fill. He endeavored first to get Mr. Loupe to take favorable action on an application which he presented for his friend. Mr. Loupe declined to take immediate action, yet that very day Mr. Loupe unknowingly signed a letter which Mr. Watson handed him along with several others. This letter awarded the coveted place to Mr. Watson's friend. This early incident in his life is related by one of his witnesses who seemed to see in it only an act of kindness done by Mr. Watson on behalf of his friend. The jury, on the other hand, may have considered it an indication of the imperious spirit which seems in later life to have dominated the man, to his hurt and injury. To secure the loan from the La Follette National Bank he did not hesitate to place one of his friends, also a friend of the bank, in a very embarrassing position, and the same was true of his action in respect of the loan which he secured from the Coal Creek Bank. In the latter instance he went to the point of making his friend believe, and so represent to the bank, that he had seen an indorser write his name on the back of the note which the bank purchased. He afterwards confessed to his friend that this was accomplished by presenting to the indorser a renewal of a note on which the indorser was already bound. The indorser signed his name on the back of the renewal note in the presence of Mr. Watson's friend. After they left the in-

dorser's office Mr. Watson showed his friend the name of the indorser which he had traced on the back of the note that later passed into the hands of the Coal Creek Bank.    The friend thought it was the genuine signature of the indorser which he had seen written on the back of the other note.    All this he confessed to his friend after his arrest.    When the fact became publicly known by reason of his arrest that he was a forger, none seem to have been more astonished than these two of his misused friends.    On the one hand, it may be said that one who misuses his friends indicates by his conduct unsoundness of mind, and an incapacity to distinguish right from wrong.    On the other hand, such conduct may be said to indicate a purpose to have his will executed by his friends at whatever cost to them.    It was peculiarly a question for the jury to determine what all this evidence signified respecting the mental capacity of Mr. Watson at the time of the acts in question in this case.

Upon a careful review we are unable to perceive that the evidence preponderates against the verdict, and the judgment of the trial court is affirmed.