McElroy v. State.

## McElroy v. State.*

### (*Nashville.* December Term, 1921.)

1. CRIMINAL LAW. Claim of offender that he acted according to command of God no defense.

In criminal prosecutions, the fact that the offender claims to have committed the act in question in obedience to a command of God is no defense. (*Post, pp.* 447-449.)

Case cited and distinguished: Watson v. State, 133 Tenn., 198.

2. CRIMINAL LAW. Person able to distinguish between right and wrong is responsible for criminal acts.

If a defendant has capacity and reason to enable him to distinguish between right and wrong as to the particular act he is then doing, he is liable for his criminal acts. (*Post, p.* 449.)

Case cited and approved: Bond v. State, 129 Tenn., 75.

3. HOMICIDE. Defendant held sufficiently aware of the wrong of his offense to be liable therefor.

Where defendant killed a man, and claimed that he did so in obedience to a command of God, and his mind was normal in all respects, except that he was eccentric as to matters of religion, a verdict of guilty was proper. (*Post, p.* 449.)

4. CRIMINAL LAW. Exclusion of testimony of expert witness as to insanity of defendant held not error.

In prosecution for murder, defended on the ground of insanity, exclusion of expert testimony by two country physicians, who were not specialists in mental diseases, but who had encountered cases of insanity in the course of their practice, was proper. (*Post, pp.* 449, 450.)

Case cited and approved: Ashby v. State, 124 Tenn. 684.

5. CRIMINAL LAW. Ruling of trial court on whether a witness is an expert will not be overruled, unless discretion was abused.

*Weakness of mind as affecting responsibility for homicide, see note in 10 L. R. A. (N. S.) 999.

McElroy v. State.

The qualification of a witness as an expert is a matter largely within the determination of the trial court as a matter of discretion, and that determination will not be overruled on appeal, unless there was an abuse of discretion. (*Post, p.* 450.)

Cases cited and approved: Powers v. McKenzie, 90 Tenn., 167; Bruce v. Beall, 99 Tenn., 303; Roper v. Memphis St. Railway Co., 136 Tenn., 23.

FROM ROANE.

Error to the Circuit Court of Roane County.—HON. SAM C. BROWN, Judge.

W. F. HOLLAND, WM. GARRETT and F. B. MCELWEE, for plaintiff in error.

WM. H. SWIGGART, JR., Assistant Attorney-General, for the State.

MR. JUSTICE GREEN delivered the opinion of the Court.

The plaintiff in error has been convicted of the murder of Ed Bennecker and sentenced to death. He has appealed in error to this court, and his case has been fully presented by able counsel appearing in his behalf.

Bennecker was clerk and bookkeeper at the commissary of the Roane Iron Company, and was killed June 30, 1921. McElroy was an ore miner.

The deceased left his home about 6:30 o'clock on the morning of his death to go to the iron company's store, where he worked. It was necessary for him to pass the house of the plaintiff in error. The latter came out of his house, armed with a shotgun, and either intercepted

the deceased or overtook him as he was passing. There was a little girl between the two men, and plaintiff in error told her to get out of the way; that he was going to kill Bennecker. Bennecker faced the plaintiff in error and said to the latter, "Don't do that," "I have done nothing," or "There is no use in that." To this plaintiff in error replied, "I have to do it," and fired his gun, shooting the deceased in the head, and killing him almost instantly.

A number of witnesses testify to the immediate facts of the killing, and there is no controversy about these facts.

After the deceased fell, the plaintiff in error knelt down and began praying over the body, and praying for the Lord to save the soul of the dead man. Plaintiff in error went into his house for a moment and came back with a Bible, and as we gather from the records undertook to read some Scripture and to deliver some sort of religious harangue.

The witnesses testified that plaintiff in error said he had been directed by the Spirit to kill Bennecker; that the Lord told him to kill this man; that he had seen a vision, and saw it in a rainbow.

To two of the State's witnesses plaintiff in error said that on the day before he had sent to the commissary for some overalls and other things, and that deceased had refused him credit, and that for this reason the Lord had directed that deceased be removed. It appears in the proof that plaintiff in error had quit his job at the mine a few days before voluntarily, in order, as he said, to prevent somebody else from losing a job. It was at a time when business was slack and miners were being laid off. Plaintiff in error told some of the State's witnesses

that his home supplies for his family were exhausted, and that times would be better, and there would be more work, since Bennecker had been killed.

No previous ill feeling appears to have existed between the plaintiff in error and the deceased. The only motive for the killing seems to have been the resentment of plaintiff in error at being refused credit by deceased, if we leave out of consideration the alleged direction of the Spirit.

At the conclusion of the State's evidence the record contains the following recital:

"The State here closed its evidence in chief. The following proceeding took place: Counsel for defendant called defendant some two or three times to take the witness chair. He did not respond to this request. Then counsel took him by the arm, and led him to the witness stand, and turned him around, and placed him in the chair, and stated to the attorney-general that he might ask him any question he desired, and all objection was waived, for whatever cause. Then counsel for the State said: 'He is not our witness. If you want to examine him in chief, we will cross-examine him.'

"Thereupon counsel for defendant said: 'We don't care to ask him anything.' Then he was excused and taken from the witness chair. Then, after a few minutes' consultation among the attorneys for defendant, they called McElroy back to the witness stand, and asked that he be sworn. He made no response to this. Then the court interposed twice, or perhaps thrice, and asked that the defendant stand up and be sworn. He refused to be sworn. Then the court stated that it might be he preferred to affirm, and did not care to be sworn, and to go ahead and ask him any questions desired. Attorneys for defendant then

asked him his age, and he refused to respond, and after repeating the question he still made no reply. He refused to utter a word. He was then requested to come back to his chair, which he obeyed."

The mother, the sister, the brother, the brother-in-law, and an uncle of the plaintiff in error were then introduced as witnesses. The substance of their testimony was this: When plaintiff in error was a young boy, about four years old, he fell into the fire and burned his head badly. A sore remained on his head as a result of this burn for several years, and his mother says that he did not appear to be right in his mind. Later in his life he became a miner. He was once kicked in the head by a mule. A piece of slate fell on him at another time. At one time he was hit in the head with a rock, and was also knocked in the head with a stick by some man who had a grudge against him, and his mother thinks that as the result of all these injuries his mind was affected. About two or three years before this killing he joined a religious sect known as the Holy Rollers, and thereafter devoted a great part of his time to studying the Scriptures. He claimed on certain occasions to have seen visions and on two or three occasions claimed to have been directed by the Lord to do some rather unusual things. The members of his family say that he was not of sound mind, and two or three of his friends testify to the same effect.

These witnesses, however, admitted that during this time the plaintiff in error, married, begot children, worked as a miner, and provided for his family. He attended to his affairs during this time without advice from any one, and aside from a few eccentric things that he did or threatened to do under the alleged direction of the Spirit, even ac-

cording to the testimony of his family, he led a normal life and seems to have been a normal man.

Witnesses introduced by the State, who had business relations with the plaintiff in error, and indeed some of his witnesses, said that they saw nothing wrong about him. These men were formerly employers and fellow workmen in the mines. He appears to have been rather prone to complain about hard times and to say that he was oppressed. During his employment at the mines he worked on contracts at times, hiring help, and at other times he worked for wages, and once ran an engine at the mines.

The record shows nothing in the life of this man, apart from his claims about messages from the Lord and spiritual guidance, to indicate that he was not in possession of an average mental equipment.

Pending his appeal this court had him examined by specialists connected with one of our insane asylums, and they report that he is mentally accountable. This was done for the purpose of determining as to the propriety of his trial in this court at this time.

On the whole proof, we think there was nothing the matter with the plaintiff in error, unless, as stated by his brother-in-law, he was "just kinder cracked on religion."

It is no new thing for criminals to attempt to justify their conduct upon the excuse that they acted on the command of God. They have frequently claimed to have seen visions and to have gotten instructions from the Almighty to do wicked things. We are told of such men in the Old Testament, and of them it is said, "They speak a vision of their own heart, and not out of the mouth of the Lord." And again, "They are prophets of the deceit of their own heart."

Such excuses were not taken into account in olden times, nor do we think they can now be allowed to avail. Men cannot put themselves beyond the reach of the law by the indulgence of such vain imaginations. To permit this would impair the practical administration of justice.

In the case of *Watson* v. *State,* 133 Tenn. 198, 180 S. W., 168, the defendant had been a great church worker, prominent in reform work in one of our cities, and he raised money on forged notes. He claimed that the money so raised was used in promoting his endeavors along moral lines, and that the Lord had approved his forgeries, in view of the purpose to which he said the money was to be applied. As a matter of fact the record indicated that the funds had been used in defendant's business. Speaking of defendant's claims above mentioned, this court said:

"A man may have the deepest religious convictions, and be thoroughly persuaded that the hand of the Almighty is upon him, and that . . . Providence will intervene to prevent the detection and punishment of any crime he may commit. Yet if he does an act which in a man of sound mind would be criminal in character, and at the same time the act is done, to use the exact words of the witness, 'he had sense enough to know that it was a violation of the law,' for which punishment was prescribed, there is no immunity from punishment for him. The law exacts obedience from him as well as others, and when he knows the act he contemplates to be a violation of the law, for which punishment is prescribed, he has then a legal con- ception of what is right, and also of what is wrong. In legal contemplation, to obey the law is right, to violate it is wrong, and if he choose the latter course, the law im plies on his part a criminal intent, and punishment is the

McElroy v. State.

result of his violation of its mandate, or its prohibition." *Watson* v. *State,* supra.

Further tending to show the mental condition of this plaintiff in error, we quote the following excerpts from the transcript:

"While Mrs. McElroy was testifying as to Jim's injuries and scars on his head, the attorney-general asked her to point out on the defendant's head where the scars were, and asked the defendant to step up to the witness, so that she could point out the scars. The defendant immediately responded, and came and exhibited his head to his mother, showing the scars on one side of his head; he voluntarily turned the other side, exhibiting another scar."

"Mrs. Powell [the sister] was asked on cross-examination if the scars still remained on defendant's head which were caused by injuries alleged to have been received, and the attorney-general asked the defendant to step forward and have his sister point said scars out. He immediately came forward and exhibited his head, pointing out the scars caused by said alleged injuries."

The rule in this State is that, if a defendant has capacity and reason to enable him to distinguish between right and wrong as to the particular act he is then doing, under such circumstances, he is amenable to the punishment visited upon his actions by the law. *Watson* v. *State,* supra; *Bond* v. *State,* 129 Tenn., 75, 165 S. W., 229; and cases cited.

Applying this rule, we think we would not be justified in interfering with the verdict of the jury in this case.

It is assigned for error that the trial court improperly excluded the testimony of two doctors, tendered by the defendant below as expert witnesses, who were asked to tes-

tify concerning defendant's mental *status*. These doctors were examined in the presence of the court, and it appears that they were merely country practitioners, who had encountered cases of insanity in the course of their practice, and who said they were able to diagnose this affliction. Neither of them undertook to treat mental diseases, but were in the habit of referring such cases of this kind as came to them to specialists prepared to treat them. Both these doctors disclaimed the idea that they were experts on insanity. We think there was no error in excluding this testimony. These doctors were no more experts than those offered in *Ashby* v. *State,* 124 Tenn., 684, 139 S. W., 872, and *Watson* v. *State,* supra.

Moreover, the qualification of a witness as an expert is a matter largely within the determination of the trial court—a matter of discretion. This court will not reverse the ruling of the trial judge on such a matter, unless we can see he was clearly in error, unless there was an abuse of discretion. *Powers* v. *McKenzie,* 90 Tenn., 167, 16 S. W., 559; *Bruce* v. *Beall,* 99 Tenn., 303, 41 S. W., 445; *Roper* v. *Memphis St. Railway Co.,* 136 Tenn., 23, 188 S. W., 588.

There being no error upon this record, the judgment below must be affirmed. It is accordingly the judgment of this court that the plaintiff in error, Jim McElroy, be delivered by the marshal of this court to the warden of the State penitentiary, and the said defendant will be by said warden safely kept at the State penitentiary until Tuesday, August 15, 1922, when within the walls of the penitentiary and in the manner provided by law the said defendant will be put to death by electrocution.