# SUPREME COURT — SPECIAL TERM — MONROE COUNTY.

## July 16, 1918.

## THE PEOPLE v. TIMOTHY F. NYHAN.

(171 New York Supplement 466.)

(1.) TRIAL—INSANITY—EXAMINATION—SCOPE.

Under section 658 of the Code of Criminal Procedure, the examination of the accused relates to his sanity as understood in medical science, and his mental ability to appreciate the nature of the proceedings of his trial and to make a defense, and not to his sanity in a legal sense, and his mental capacity to know the nature and quality of his act and that it was wrong.

(2.) INSANITY AT TIME OF TRIAL—TEMPORARY COMMITMENT TO ASYLUM—TRIAL.

A police officer, accused of the murder of his wife, who has hallucinations of hearing and fixed delusions of persecution connected with the crime with which he is charged, is not capable of appreciating the proceedings of a trial and conducting his defense, and should be committed to an asylum until he becomes sane, and then placed on trial.

Timothy F. Nyhan was accused of the murder of his wife. Application for confirmation of report of commissioners appointed to inquire into defendant's sanity granted, and defendant ordered committed to a State lunatic asylum until his sanity and return to custody of sheriff, and then placed on trial.

*Charles E. Callahan,* of Rochester, for the motion.

*John W. Barrett, District Attorney,* of Webster (*William F. Love,* of Rochester, of counsel), opposed.

RODENBECK, J.:

It is a fundamental principle of modern society that no person accused of a crime, who is insane, so as to be unable to appre-

ciate the proceedings of his trial and to make a defense to the crime with which he is charged, shall be placed upon trial, and it applies to any stage of the proceeding, even after conviction and pending an appeal. (People v. Skwirsky, 213 N. Y. 151, 107 N. E. 47.) This humane principle has been carried into the statutes of this State, which provide that a person cannot be tried, sentenced to any punishment, or punished for a crime while he is in a state of insanity, so as to be incapable of understanding the proceedings or making his defense. (Penal Law [Consol. Laws, ch. 40], § 1120.) They also provide that an act done by a person who is insane is not a crime, but that such a person is not excused from criminal responsibility unless at the time of committing the alleged criminal act he was laboring under such a defect of reason as not to know the nature and quality of the act he was doing, or to know that the act was wrong. (Id. section 1120.)

There is a distinction, however, between " insanity " as the term is understood in medical science and " insanity " as the term is understood in legal science, so as to relieve from criminal responsibility. A person may be insane, as that term is ordinarily understood, and still be responsible for the commission of a crime. The statute recognizes this distinction in providing that any person in confinement, under indictment or on a criminal charge, who shall appear to be insane, may be examined and committed to a State institution for the care, custody, and treatment of the insane, there to remain until restored to his right mind, and then brought to trial. (Code of Criminal Procedure, § 836.) The word " insane " as here employed, does not mean criminally irresponsible, but so mentally diseased as to impair his reasoning faculties sufficiently to render it inhuman and unjust to place him upon trial. Another provision of the statute provides that, when a defendant pleads insanity upon arraignment, the court, instead of proceeding with the trial, may appoint a commission to examine him and to report to the court

as to his sanity at the time of the commission of the crime. (Id. section 658.) If the commission find that the defendant was insane at the time of the commission of the act and at the time of the report, the trial is required to be suspended until he becomes sane, and meanwhile, if his discharge is deemed danger-out to the public peace and safety, the accused is required to be committed to a State lunatic asylum, there to remain until he becomes sane, when he is to be returned and placed on trial, and subsequently sentenced or discharged. (Id. sections 658-661.) The word "sanity," as applied to the inquiry to be made by the commission, does not refer to the criminal responsibility of the accused, but to the condition of his mind and reason with reference to his ability to understand the proceedings and make his defense. (People v. Rhinelander, 2 N. Y. Crim. 325.)

The commission in this instance, consisting of Arthur E. Sutherland, a former justice of the Supreme Court, Eugene H. Howard, superintendent of the Rochester State Hospital, Rochester, N. Y., and Peter W. Neefus, a specialist in nervous diseases and insanity, has found that the accused was insane at the time of the alleged homicide and at the time of their report, and that he was at those times afflicted with dementia of a paranoid type and will continue during his life. The commission further reports that he has had hallucinations of hearing voices speaking to him, which existed for at least two years prior to the homicide, and that he has suffered from delusions of persecution, which are progressive and have probably been developing for five years, and that his insanity makes him a dangerous person to be at large. The conclusion of the commission is abundantly sustained by the evidence.

The evidence taken before them shows that the accused was convinced that there was a power being exercised over him through what he called the "blower" and the "wireless," and that he believed that certain people were working the "blower"

and "wireless" on him and his wife. When asked how they drew his wife and her sister, whom he also tried to kill, under their influence, he said:

"She used to go over to her sister's, and I think they were working it on her; they had the wireless on her, because everything they said there came back to me. They had the wireless in the house, in a little black case with straps. One time I found one in the hall, and I didn't know what it was; it was a little black case. I said: 'What is that?'" And she said: 'Don't touch it; it is something belongs to my sister.' It was black, with two straps around it, about as big as that."

The conception of the blower is even more indefinite than that of the wireless. Referring to voices telling him to shoot, he said:

"Q. You can't say they ever told you to shoot? A. Maybe they did when I was asleep. Q. Do you know they did? A. I wouldn't say, but I think I heard that; when the blowers were on me. * * * Q. Did you hear the voices as you hear my voice? A. No, sir; it was the blower—'Shoot,' 'shoot.' * * * A. I used to hear this blower, and when I would go to sleep it would stop all of a sudden. * * * Q. Why would you keep a gun under your pillow, in your bed, in your house? A. Because people were coming in. I used to hear the blowers when I woke up, and then I would shoot it. There was a lot of shingles took off that side of the house. Q. What blowers? A. The blowers they have on me at the jail."

These influences were the dominant, persistent, and controlling idea of his mind, which he was unable to shake off, and with which he connects his imaginary troubles. He believed that he was being persecuted, and this thought was developing into one of conspiracy. He believed Dr. Stapleton, the police surgeon, was plotting against him, and this belief caused him to shoot at the doctor, and was a justification in his mind for the shooting:

" Q. You think Stapleton was plotting against you? A. Yes, sir. Q. Were you clear in your mind the doctor tried to take your life by other means, and tried to take your life by poison? A. Yes, sir. Q. Didn't you think you had a right to protect yourself against a man like that? A. Yes, sir."

Upon matters not associated in his mind with this delusion of persecution he speaks rationally enough, which is evidenced by his examination by the police authorities; but when the subject of his delusion is touched upon he speaks irrationally, incoherently, and inconsistently, in a way that is convincing that he is suffering from a serious defect of reason. He has hallucinations and hears voices, particularly at night, that do not exist. He claims to be able to hear through the wireless what others are saying. These voices and the indefinable " blower " were telling him to " shoot." With respect to them he said:

" Q. What did they say to you? A. ' Shoot, shoot,' in a low voice. * * * Q. Did you hear it in a voice like my voice? A. Yes, sir; and I heard lizards and bees. * * * Q. Did you hear the voices as you hear my voice? A. No, sir; it was the blower—' Shoot,' ' shoot.' Q. Could you feel the air coming in? A. No; not the air, but you could hear a low voice and the lizards."

He said he heard the neighbors running through the streets and that he heard voices telling him to shoot:

" I used to hear them running through the street, and I would say, ' I will take a shot at that fellow,' and I let him go, and ' I will shoot at the fellow above,' and I would go to the door and couldn't see anybody."

The fact that he would hear the voices of neighbors outside, and yet could not see his neighbors when he looked for them, shows that he had not developed any illusions of sight. At least the evidence does not reveal any. He believed that Dr. Stapleton was trying to persuade his wife to put him out of the way. When asked if he had had trouble with Dr. Stapleton, he said:

" A. Yes; Stapleton said he wanted the woman to give me a pill and put me out of the way, and he said, ' He is no more good to you now.' I was in bed when he called, and the Missus called me downstairs, and I heard him say, ' He is no good now; give him a pill and put him out of the way."

While in one breath he expresses confidence in his wife, in the next he says that she was under the influence of these mysterious forces who operated the " blower " and " wireless," and was trying to poison him:

" Q. Did you think she wanted to poison you? A. I guess so. Q. Was there poison in those pears; you remember the pears you threw away? A. Yes, sir; I didn't eat them because those people were against me. Q. What other attempts did they make to poison you? A. There was some stuff over the sink. I didn't use it. She said they were harmless. Winslow left them. Q. Did she urge you to use them? A. Yes, sir; she told me that Winslow said it would build up my constitution. Q. How could you tell these were poisonous? By the smell? A. By the bottle. * * * A. * * * I thought she was giving me something in my coffee. Q. Yet you told Judge Sutherland you didn't suspect her; but she was under their influence? A. Yes, sir; those fellows got her, too."

The commission of the crime by him is well known, and yet he stoutly maintains that his wife was killed by two men, who came into the house that night, whom he seems to associate indefinitely with the " blower " and " wireless," and the individuals who are working to destroy him. These references to the condition of the defendant's mind and these brief extracts from the evidence give an imperfect and incomplete conception of the extent to which his reasoning power was destroyed by hallucinations and fixed delusions, which render it impossible for him to reach sound and normal conclusions upon matters connected directly with the crime.

A man so afflicted, who now firmly believes that these influ-

ences are at work, and who is convinced that a " blower " and " wireless " are being operated on him, who perverts and imagines noises and voices of people, who is urged by influences and voices of his own insane creation to protect himself, and who believes that his wife was killed by men who sought also to destroy him, is hardly in a mental condition to appreciate the proceedings of a trial and undertake his defense. Under these circumstances, it is the duty of the court as prescribed by statute to order him committed to a State lunatic asylum until he becomes sane, when he shall be returned to the custody of the sheriff and placed upon trial.

So ordered.

---

## NOTE ON COMMISSION TO EXAMINE INSANE PRISONER, CODE CRIM. PRO., § 658.

The provisions of the Code simply invests the court with the power to appoint a commission to examine the prisoner who pleads insanity, and report to the court as to his sanity at the time of the commission of the crime, and is not mandatory. (People v. McElvaney [1891], 125 N. Y. 596, 8 N. Y. Crim. 156.)

It is, however, the duty of the court, when the situation is brought to its attention by responsible parties, to itself make a sufficient inspection and examination to determine whether the application is made in good faith and upon plausible grounds. (Id.)

The history of legislation in reference to the defense and plea, given. (Id.)

Where a defense of insanity is interposed and counsel assigned to defend the prisoner charged with an offense punishable by death, pleads insanity and the plea is sustained, counsel was not entitled to the $500 fee allowed by section 308 of the Code Crim. Pro. (People ex rel. Mullen v. Coler [1901], 61 App. Div. 539.)

The testimony of a witness residing out of the State cannot be taken on commission to be read before commissioners appointed to examine and report on the sanity of the defendant. (People v. Haight, 3 N. Y. Crim. 60.)

Sections 658 and 659 of the Code of Crim. Pro. authorized the defendant under indictment to be committed to the lunatic asylum only when the commission appointed to examine him reports him as insane. The finding by the commission that he is not insane but only mentally impaired, does not warrant the transfer to an asylum, and by habeas corpus he should be remanded to the custody from whence he came. (People ex rel. Forrester v. Sheriff N. Y. County, 114 App. Div. 861.)

Where a trial court, at the request of counsel for a defendant charged with the crime of murder, at the time the indictment was moved for trial, appointed two expert physicians to examine the defendant and report as to his sanity, and adjourned the trial until such report could be made, and the physicians, after making an examination, reported that in their judgment the defendant was sane, in which opinion a third physician, who at one time had charge of defendant, concurred, the court is justified, in the exercise of sound discretion, in denying a motion made in behalf of defendant, based upon the affidavits of his attorneys, for a commission, pursuant to section 658 of the Code of Criminal Procedure, to examine the defendant and report to the court as to his sanity at the time of the examination, where no evidence is presented to controvert the report of the medical experts, who examined the defendant, and to show that he was insane, except the affidavits of his counsel, which contained few facts and consisted mainly of the expression of their own opinions, unsupported by the affidavit of any physician. (People v. Tobin, 176 N. Y. 178, 284.)

By a plea of insanity a defendant in a criminal action voluntarily submits the question of his sanity to the court by which he is tried, and, although the direct issue is insanity at the time of the commission of the alleged crime, yet evidence of such insanity may show that it is chronic and continuous or progressive and incurable. (People ex rel. v. Chanler, 133 App. Div. 159.)