THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ROBERT IRWIN, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ROBERT IRWIN, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ROBERT IRWIN, Defendant.

Court of General Sessions of County of New York, March 24, 1938.

*William Copeland Dodge, District Attorney* (1937) [*Miles M. O'Brien, Louis J. Capozzoli, Assistant District Attorneys*, of counsel], for the plaintiff.

*Thomas E. Dewey, District Attorney* (1938) [*Jacob J. Rosenblum, Jacob J. Grumet, Assistant District Attorneys*, of counsel], for the plaintiff.

*Samuel S. Leibowitz* [*William Richter* of counsel], for the defendant.

The undersigned commissioners were duly appointed by an order of the Court of General Sessions of the County of New York to examine into the mental condition of the above-named defendant in the three cases referred to and to report to the court.

Three legally distinct crimes are charged in three separate indictments. Indictment No. 213646 charges the murder of one Veronica Gedeon; indictment No. 213647 charges the murder of one Frank Byrnes; indictment No. 213648 charges the murder of one Mary

Gedeon. But as all of the crimes were committed on the same day and within a few hours of each other, and as the evidence considered applies, with no material variation, to each of the alleged crimes, it is apparent that but one report is required to be made.

In this connection, it is stated that prior to the entrance upon the performance of their duties as commissioners, the undersigned severally took the oath prescribed by law and thereafter met and held sessions for the taking of evidence, attended by a representative of the district attorney's office for the People, and by the defendant's attorney for the defendant.

Twenty-two sessions were held at which testimony was taken, and ten executive sessions were held at which said testimony and the formulation of this report were considered.

Twenty-eight witnesses were orally examined, the transcript of their testimony consisting of 756 typewritten pages, exclusive of exhibits. A large amount of documentary data was also examined by the commission.

The issues referred to this commission involve the mental condition of the defendant Robert Irwin at the time of the commission of each of the alleged crimes referred to in said indictments; and also whether he is now capable of understanding the proceeding and making his defense on the trial of the indictments.

The said issues are separate and distinct both as to mental condition and chronology. That is, one issue relates to mental condition at the time of the alleged crimes; the other issue relates to mental condition as of the time of this report, referring to the capacity of the defendant at the present time to understand the proceedings, and make his defense. The latter issue does not relate to criminal responsibility. The former does, exclusively.

It is a legal presumption, subject to rebuttal, that all men are sane and intend the natural and probable consequences of their acts. Upon the issue of insanity or mental incompetency, in a criminal prosecution, the burden of proof is, therefore, in the first instance, upon the person claiming to be incompetent, or in whose behalf lunacy or mental incompetency is claimed. In the present proceeding, however, the commission has not been influenced by such presumption. It has made inquiry into the issues referred to it by the court in such manner as circumstances have allowed and herein reports the conclusions which, to the minds of the members of the commission, are sustained by a preponderance of evidence.

In New York State insanity, to constitute a defense to crime, must be legal insanity as distinguished from what might be loosely

or colloquially termed medical insanity. That is to say, it is required by law that to establish a defense in a prosecution for what would otherwise be a criminal act, the alleged lunatic or insane person must show that he was laboring under such a defect of reason that he did not know the nature and quality of the act, or did not know the act was wrong. (See Penal Law, § 1120.)

If, on the other hand, a person indicted for an alleged criminal act was legally sane at the time of the commission of the act, he may, notwithstanding, not be tried if since the commission of the act he has become " incapable of understanding the proceeding or of making his defense."

To state the provisions of law more exactly, the language of section 1120 of the Penal Law is that:

" An act done by a person who is an idiot, imbecile, lunatic or insane is not a crime. A person can not be tried, sentenced to any punishment or punished for a crime while he is in a state of idiocy, imbecility, lunacy or insanity so as to be incapable of understanding the proceeding or making his defense. A person is not excused from criminal liability as an idiot, imbecile, lunatic, or insane person, except upon proof that, at the time of committing the alleged criminal act, he was laboring under such a defect of reason as:

" 1. Not to know the nature and quality of the act he was doing or,

" 2. Not to know that the act was wrong."

Lest the foregoing language should be construed too leniently toward offenders, there is a complementary provision (Penal Law, § 34), that: " A morbid propensity to commit prohibited acts, existing in the mind of a person who is not shown to have been incapable of knowing the wrongfulness of such acts, forms no defense to a prosecution therefor."

Thus, it has been held that evidence that a defendant charged with first degree murder was a " psychopathic inferior," or a man of low and unstable mentality, did not require a finding from the jury that he was mentally irresponsible, within the meaning of section 34 of the Penal Law. (*People* v. *Moran*, 249 N. Y. 179.)

So also it has been held in other cases that a defendant, even of inferior intellect and morally depraved, may be held responsible for the commission of a crime, where the evidence shows that he knew the nature and quality of his act and that it was wrong.

The report of the commission will, following the words of the statute (Penal Law, § 1120), consider: (I) Whether Irwin, at the time of the homicides for which he stands indicted, was laboring under such a defect of reason as not to know the nature and quality of his acts; or (II) whether Irwin, at the time of the homicides for which he stands indicted, was laboring under such a defect of

reason as not to know that his acts were wrong; and (III) whether he is now in such a state of idiocy, imbecility, lunacy or insanity as to be incapable of understanding the proceedings or making his defense.

I

Concerning the meaning of the words " nature and quality (of the act)," and the word, " wrongful," as employed in section 1120 of the Penal Law, Judge CARDOZO stated, by way of illustration in the case of *People* v. *Schmidt* (216 N. Y. 324, 339), that a young mother who should intentionally kill her infant child to whom she was " devotedly attached," would doubtless know the nature and quality of the act and know that the law condemned the act. But, said Judge CARDOZO, if she was inspired by an insane delusion that God had appeared to her and ordained the sacrifice, it would seem a " mockery to say that, within the meaning of the statute, she knew that the act was wrong.' "

This language was used by Judge CARDOZO twenty years before the decision of the Court of Appeals in the case of *People* v. *Sherwood* (271 N. Y. 427), which was a prosecution for murder of a young mother who had drowned her infant son, two years old, in a pool of water eight inches deep, by holding his head in the water until he was suffocated, because, in consequence of a series of misfortunes, the woman felt that in death alone could there be safety and freedom from pain, suffering and misery for her child. Judge CROUCH, writing for the Court of Appeals, said: " That the defendant knew what she was doing — the nature and quality of the act — could be a matter of small doubt to the lay mind."

In *People* v. *Schmidt* (216 N. Y. 234) Judge CARDOZO referring to *People* v. *Purcell* (214 id. 693), said: " There the trial judge (KNOTT, J.), in a careful and able charge told the jury that knowledge of the nature and quality of the act, has reference to its physical nature and quality, and that knowledge that it is wrong refers to its moral side; that to know that the act is wrong, the defendant must know that it is ' contrary to law and contrary to the accepted standards of morality.' "

With the foregoing provisions of the Penal Law in mind, as authoritatively construed by the courts, we approach the question whether, when Irwin killed successively Mary Gedeon, Veronica Gedeon and Frank Byrnes, he understood the physical nature and quality of his acts and whether he knew that the acts were wrong — as contrary to law or contrary to accepted standards of morality.

As bearing upon these issues, the commission was able to adduce the testimony of a number of witnesses concerning the details of Irwin's life when a student in St. Lawrence University, at Canton,

N. Y., covering the period of about six months prior to the crime. His career there was normal and uneventful in all respects, until a few days before the homicides, when he assaulted a student who had provoked him by some trivial act or affront. As a result of this misconduct Irwin was dismissed from college and came to New York. The afternoon preceding the tragedy was spent by Irwin in the company of a Miss Leonora Sheldon, of Woodstock, Vt., an intelligent and entirely irreproachable young woman, who had attended Vassar College. Miss Sheldon was the *fiancée* of a student at Canton who had become a friend of Irwin's, Irwin having become acquainted with Miss Sheldon at Canton in this way. In company with her brother, Miss Sheldon and Irwin visited the Museum of Natural History Saturday afternoon, March 27, 1937, in an effort to secure employment for Irwin there, Miss Sheldon's brother being acquainted with some of the members of the staff of the Museum. After this visit Miss Sheldon and Irwin, without the brother, went to the Metropolitan Museum of Art. Miss Sheldon told the commission that she had rarely spent a more interesting or instructive afternoon than at the Metropolitan Museum with Irwin, because of the latter's knowledge of art, of pictures and of sculpture, and his entertaining discussion of these topics. Miss Sheldon saw Irwin last about five-thirty o'clock in the afternoon of Saturday, March 27, 1937. It was during this night that the three persons were killed by Irwin.

Three months later, when Irwin surrendered himself in Chicago and was brought to New York, his narration of the details of the homicides conformed in all material respects with the physical condition of the apartment of the Gedeons, the condition of the bodies as reported by the autopsies, and the circumstances surrounding the murders as discovered by the New York police officers the day following the homicides.

In his statement at police headquarters in New York, when Irwin stated he had first killed Mary Gedeon, the mother, he was asked: " Q. How?  A. Strangulation."

The following questions were then asked by District Attorney Dodge and answered by Irwin: " Q. What time did you arrive at the apartment that night?  A. Something like nine o'clock — I don't remember.  Q. How did you get into the apartment?  A. She [Mrs. Gedeon] let me in.  Q. Was she alone at the time? A. Yes.  Q. You talked with her, I presume?  A. Yes.  Q. Tell us briefly what you did before the first crime was committed? A. I drew her picture and asked about Ethel and she said she was not there.  I said, she will be here and I am going to stay until she is here.  Then she ordered me out and I hit her and stran-

gled her. Detective: What did you hit her with? A. My fist. Detective: Where? A. Some place in the face. Q. You say you strangled her? How? A. With my hands. Q. What did you do after you strangled her? A. I threw her under the bed. Q. What happened then? A. I waited for Ronnie. Q. Before you waited for Ronnie, what happened when she was put under the bed? A. She was speaking about Frank Byrnes. Q. At the time you strangled Mary Gedeon, was Byrnes, the boarder, in the house? A. He was in his room, the light was off. Q. Did you see him? A. I saw him previous to that. Q. What time? A. I suppose it was ten o'clock or something like that. Q. Was that before you strangled Mary? A. Yes. Q. Did she introduce you to him? A. Yes. Q. What did she say when she introduced? A. She said he is an old friend of ours; it was brief. Q. Then he went in his room and shut the door? A. Yes. Q. Then you waited and Ronnie came in? A. Yes. Q. What did you do when Ronnie came in? A. She went to the bathroom, I waited; when she came in, I strangled her. Q. Was she dressed or undressed? A. She was in her chemise or something like that. Q. What did you do with the chemise? A. Tore it up. Q. What did you do after you strangled her? A. Left her lying on the bed. I didn't attack either of the women. Q. What did you do after you strangled Ronnie? A. I went in and killed Byrnes. Q. How? A. With the ice pick. Q. In the bed? A. Yes. Q. Did he make any outcry? A. No. Q. Was he asleep? A. Yes. Q. How did you use the ice pick on him? A. I stabbed him in the head. Q. How many times? A. I don't remember. Q. What did you do with the ice pick? A. I kept it and finally discarded it in Philadelphia. Q. Did you take anything out of the apartment after the three people were killed? A. Yes; I took that alarm clock. Q. Is this the alarm clock here? A. Yes. Q. That was where, when you first saw it? A. It was on the bed in the room where Ronnie was slain. Q. That glove, is it yours? A. Yes. Q. You left that in the apartment? A. Yes, and I knew I left it there. Q. What happened to the mate of it? A. I threw it away on Second avenue."

Certain of Irwin's evasions, when first interrogated by District Attorney Dodge at police headquarters the night of Irwin's arrival by airplane from Chicago, deserve consideration here. When Irwin was first questioned, it should be noted, he stated that he did not wish to give any information relating to the crimes, and it was only after Dr. Frederick Wertham, formerly of Bellevue Hospital, had been sent for at Irwin's request that, following a conference with Dr. Wertham, Irwin consented to go into details of the tragedy.

The evidence showed that after Irwin had surrendered in Chicago

he made a detailed statement to representatives of the *Herald-Examiner*. For this it was agreed that Irwin should be paid $5,000. On the airplane trip from Chicago, accompanied by Lieutenant Owens and Detective Crimmins, of the New York police force, Irwin had, in effect, repeated the statement made in Chicago. After arrival at police headquarters in New York city, District Attorney Dodge, desiring to interrogate Irwin, stating it was his duty as a public officer to warn Irwin that anything said might be used against him, then asked Irwin: " Do you wish to make a statement? " Irwin answered: " Mr. District Attorney, I have made ———. I wish to refer you to Lieutenant Owens. Whatever is in store for me, I will take it, but I think I have a legal right not to speak any more than I have spoken, until I have a lawyer. I don't mean to make difficulties; I hope I don't." District Attorney Dodge: " Q. We don't want to press you. We understand you made a statement to Lieutenant Owens, is that correct? A. I refer you to Lieutenant Owens. Q. Do you want him to speak for you? A. I want my lawyer to speak for me."

Lieutenant Owens then suggested that because the contract with the Chicago *Herald-Examiner*, under which Irwin was to be paid $5,000, provided that he should not, within a limited period, disclose the facts to any one else, perhaps Irwin felt a restraint which would prevent his " talking to the District Attorney."

In response to this suggestion, Irwin said: " No, sir, I believe I have every right to talk to you [the district attorney] or to Commissioner Valentine, or I suppose to any of you. As far as that contract is concerned, I will not break the contract, but my own legal rights I am thinking of now."

District Attorney Dodge: " Q. We are not concerned with your contract for the papers, we will not do anything to oppose that, that is not our function. But the newspapers, the Hearst papers, the *Daily Mirror* and other papers, have published what is supposed to be a confession made by you to the Hearst Newspaper outfit and others. What we want to know is the story which you told to the newspaper people, is that correct, a true statement? A. I have said everything that I care to say. Q. You made a contract with the Hearst people and you are to get $5,000 for your story, and that story included a confession, I take it — at least, that is what was published in Sunday's *Daily Mirror*, under date of June 27, 1937, that is in full, it gives quite a full account of your story, what we are interested to find out, is that true? Of course, I assume that you would not tell a lie to the newspapers for the sake of getting $5,000? A. I don't mean to make any difficulties, sir, I wish you would please supply me with a lawyer, I have nothing

to hide. * * * Q. You expect to get $5,000 from the Hearst Newspapers for this statement, don't you? A. I don't mean to create difficulty. Q. All I want is the truth. A. You will get every bit of the truth. Q. We read something in the newspapers and we would like to know what you are purported to have said is the truth * * *. A. I have nothing more to say. Q. Why haven't you anything to say? A. When the time comes I will have plenty to say. Q. Why not now? A. Because I have a legal right to have a lawyer first. Q. That is correct. Why do you need a lawyer? A. Any man going into court, especially on a charge like this. Q. What charge have you in mind? A. I am charged with the Gedeon murder. Q. You really think so and you think you need a lawyer under the charge of murder. If the charge of murder is made against you, do you think you will need a lawyer? A. Yes. Q. Why, under the circumstances? A. Because I am going into court and I don't understand the legal end of it. * * * Irwin: When I get on the stand, you will find that I have nothing to hide, and I will have the truth, the whole truth. Q. What stand do you mean? A. Stand in court. Q. Do you expect to go on the stand in court? A. If a man is on trial he generally gets on the stand. Q. What does he do? A. He answers questions. I think I will be answering your questions. Q. Who is present when he is answering those questions? A. The jury. Q. And you have a lawyer for that? A. I hope to. Q. Who else asks you questions if you are brought to trial? A. You have a lot of witnesses, my own lawyer if I get one, and yourself. Q. Do you think I will be asking you any questions? A. I don't know. Q. I mean somebody from the prosecutor's office? A. Yes. Q. Why? A. Why not. Q. I am asking you why? A. Because that is the general procedure. Q. In what way? A. General procedure, when a man is in court charged with murder, that the prosecuting attorney or somebody from the District Attorney's office will ask him all about it, just as is done in every murder trial, as in the Hauptmann case."

That Irwin contemplated the possibility of a trial which would terminate by committing him to an institution for the insane is also clear from the evidence. In police headquarters Irwin was asked further about the $5,000 which he had obtained or expected to be paid him by the Hearst newspapers. He said that he would want only a small portion of this for himself, explaining: " If I find myself in an institution for life or something like that, I would like to get a small amount of that money so that I can hire some one of my fellow patients or prisoners, whatever you want to call them. In such an institution for one dollar a week you can get people to do many things for you. That is all I want out of it.

The rest of it I want to go to my brothers. All those details can be taken care of by banks. You know more about business than I do. * * * Q. You would want the money to draw interest I suppose? A. That has not occurred to me, but if there is any interest coming, yes."

The facts of Irwin's voluntary surrender in Chicago and the shrewd bargain struck with the Chicago *Herald-Examiner* which Irwin initiated and accomplished by himself indicates a mentality of keenness and comprehension. He even explained in his statement at police headquarters in New York city that he had given himself up to the Hearst papers " because I figured that of all publications they would give me more than any others." True, Irwin stated that he wanted the money which the newspapers agreed to pay him ($5,000) for his two brothers, both of whom he described as being inmates of western prisons. Whether or not the real reason for his surrender in Chicago, after his identity had been discovered in Cleveland, was that he wanted to raise money for his brothers, whom he had not seen for many years, is unimportant here.

To summarize under this head it may be said that it is the considered opinion of the members of the commission that Irwin knew the nature and quality of the acts which caused the death of the three individuals for whose murders he is under indictment, as these words have been authoritatively construed by the courts.

## II

We have seen that a person may not be excused from criminal responsibility unless he is under such a defect of reason as not to know the nature and quality of the act, *or* (not *and, People* v. *Sherwood,* 271 N. Y. 427, 432) that the act was wrong. Under the latter head, furthermore, the meaning of the word " wrong " must be considered — whether merely as violative of law or as also involving moral dereliction.

The facts and circumstances of Irwin's carefully planned and cleverly consummated escape show that Irwin knew that for the acts which he had committed the law provided a punishment. He was asked: " Q. Did you take anything out of the apartment besides the clock? A. I took some food out, because my face was scratched and I knew I would have to remain in hiding a little bit. Q. Did you take these two bags? A. These two bags were not there, they were in the room. Q. Did you take anything else out of the apartment besides the clock and some food? A. Oh, yes, I took some pictures. Ethel had some pictures she had given me and I returned them to her, and in the meantime they had given

me some of them back. Ronnie had given them to me or somebody, maybe Ethel or her mother, but there were more, and I wanted to get those pictures of Ethel and I searched the bureau drawers for those pictures and I saw Ronnie's diary, but I didn't bother with it. I saw no pictures of Ethel and two pictures of Ronnie, which I took. Q. Then you put them with your things from your room into the two bags which we have here? A. Yes. Q. Then you took the two bags where? A. Put them in the Grand Central Station. Q. Checked them there? A. Yes. Q. What did you do with the check? A. Threw it away in Cleveland, Friday night. Q. Friday, June 25, 1937? A. Yes. Q. These bags that you have seen here, these were your bags, is that right? A. Yes. Q. In the bag, among other things, was the clock that you identified, which you took from Ronnie's bedroom? A. Yes."

Irwin was further interrogated: " Q. (By Commissioner Valentine) When you left the suitcases in the Grand Central depot, checked them, you intended to call for them at some future time? A. I intended to go to Philadelphia one day, Washington one day, to come to New York and return to Canton. Q. And pick up the suitcases and go to Canton, N. Y.? A. Yes; I didn't want to pay for my room for a whole week in order to leave my suitcases there for two days. Then at the same time I realized that there was a possibility of a break. Q. (By Commissioner Valentine) You mean a break against you in that they would be discovered and identified as having been your property, placed there by you? A. Yes. Q. For that reason you did not go back to claim them? A. I went to Philadelphia and there I saw the headlines. Q. The reason you didn't come back, you believed if you done so you would be apprehended, that is true, isn't it? A. Yes."

Coming next to the consideration of whether Irwin knew that the killing of the Gedeons, mother and daughter, and Byrnes, the lodger, was morally wrong, as distinguished from a violation of law, it may be stated that by the weight of authority in New York it is held that knowledge that an act is wrong, as that word is used in section 1120 of the Penal Law, requires more than mere knowledge that the act is contrary to law. But this language of the statute does not require that an alleged lunatic should understand the act to be wrong according to his own standards of morality, but only that it should be wrong according to generally accepted standards. Furthermore, " knowledge that the act is forbidden by law will in most cases permit the inference of knowledge that according to the accepted standards of mankind, it is also condemned as an offense against good morals." (CARDOZO, J., in *People* v. *Schmidt*, 216 N. Y. 324, 340.)

A Texas decision, in which State there is a statute similar to that of New York, announces the principle differently but with equal clarity. In this case it was said that " if a person has sufficient mental power fully to appreciate and know what he is doing, he must necessarily know that the killing of a human being is wrong." (*Montgomery* v. *State*, 151 S. W. 813, 817.)

Irwin's escape, after the commission of the murders, followed by the concealment of his identity for three months, shows, at all events, as we have already observed, that he knew that the acts he had committed were a violation of law. Indeed, some of the circumstances connected with his escape show shrewdness, and even cleverness. For example, as we have seen, Irwin told the New York police when brought back to New York city from Chicago after his surrender there, that in the struggle with Mrs. Gedeon his face had been scratched. For this reason, when he left the Gedeon apartment he removed food from the Gedeon icebox, and took it with him so that he would not have to go into a shop to purchase food, because he thought the scratches on his face might betray him and lead to his discovery and apprehension.

It may be mentioned also that at one point in his statement at the police department, when interrogated by District Attorney Dodge, he stated that he had felt remorse for the killing of the Gedeons and Byrnes, explaining, however, that he thought the lives which he had taken were not lost. " They were borrowed," declared Irwin, " and I can repay them." He was then interrogated: " Q. What do you mean by that? A. I don't believe anything is lost and that all life is only a part of the divine life."

Irwin further explained: " In the first place, none of those persons are dead, they are gone from this plane, but they are not, as I say, lost. When they asked Marconi if he believed in mortality, he said it does not seem to me to be in keeping with the economy of nature. You can't destroy one atom of matter, how are you going to destroy the spirit? "

Assuming these answers have been sincere, and not due to a design to feign irrationality or irresponsibility, it is not believed that the state of mind they reveal would constitute irresponsibility for crime under the New York Penal Law, but rather show poorly digested reading in philosophy and psychology.

" Whatever the views of alienists and jurists may be," said Judge CARDOZO in *People* v. *Schmidt* (216 N. Y. 324, 339), " the test in this State is prescribed by statute and there can be no other." This language was used by Judge CARDOZO in his comment upon a Massachusetts case (*Commonwealth* v. *Cooper*, 219 Mass. 1, 5) which held that an offender was not responsible if he were " so

mentally diseased that he felt impelled to act by a power which overcame his reason and to him was irresistible." But Judge Cardozo said: " That is not the test with us."

The fact that Irwin has been from time to time under treatment for mental disorders has not been overlooked by the commission, nor the fact of his superficial attempt at self-mutilation, that he might, as he explained, concentrate his genius on his art. Partial insanity or previous insanity or insane delusions in respect of matters unrelated to an alleged crime do not affect responsibility in New York State, if, in spite thereof, the person charged understands the nature and quality of the act or that the act was wrong.

No doubt it may be said that Irwin has the character defect and the emotional instability of the psychopathic personality. But no evidence has been presented to show the existence of a compelling delusion which caused the crimes. Nor has any evidence been produced to show any organic disease of the brain.

As was said by Rodenbeck, J., in *People* v. *Nyhan* (Supreme Court, Special Term, Monroe county, 1918, 171 N. Y. Supp., 466): " There is a distinction   *   *   *   between ' insanity ' as the term is understood in medical science and ' insanity ' as the term is understood in legal science, so as to relieve from criminal responsibility. A person may be insane, as the term is ordinarily understood, and still be responsible for the commission of a crime."

It seems clear to the commission from what has foregone that the evidence preponderates in support of the view that Irwin not only knew and understood the physical nature and quality of his acts when he took the lives of his victims, but knew that the acts were forbidden by law and had sufficient intelligence and understanding to know and did know that the murder of a human being was forbidden by accepted standards of human conduct and morality.

### III

The further and remaining issue is whether Irwin is now incapable of understanding the proceeding or of making his defense.

In considering the questions whether, when Irwin committed the alleged murders, he knew the nature and quality of his acts and knew that the acts were wrong, the evidence given the most weight has pertained to Irwin's life and social intercourse and contacts prior to the date of the alleged crimes, though upon that issue the substantial accuracy of Irwin's recollection of the circumstances surrounding the crimes, as shown by his statements to the Chicago newspaper, on the airplane from Chicago to New York, and at police headquarters in New York city, has also been given consideration.

Additional evidence, some of which would be irrelevant upon the question of the mental condition of Irwin when the alleged crimes were committed, has been considered by the commission in reaching its conclusion upon the issue whether Irwin is now capable of understanding the proceeding and of consulting intelligently with counsel concerning his defense.

As bearing especially upon this issue, the commission had the benefit of the testimony of Warden Adams of the Tombs, who, though showing at all times due consideration for the welfare of Irwin as an inmate of that institution, co-operated intelligently and helpfully with the commission, which held a number of sessions in what is known as the counsel room of the Tombs.

It is in evidence that Irwin, except for a tendency to become irritable on slight provocation, has been for the most part a model prisoner since his incarceration following his surrender in Chicago and his return to New York in the custody of officers of the New York city police department. There have been a few exceptional episodes, however — one, when he threw the contents of a cup of water over a prison physician and grew violent when removed to the isolation cell; another when in the Raymond Street Jail, Brooklyn, Irwin was sent for by his counsel and exhibited to a group of newspapermen. On this occasion Irwin became apparently excited and gesticulated with incoherent exclamations. When taken from the room, and when the press representatives had gone, Irwin became quite calm again and created no further disturbance on that occasion. There was another scene of disorder on the day the commission first visited the Tombs Prison for the purpose of interrogating Irwin. For that purpose Irwin was brought down from his cell and left locked in the counsel room pending the arrival of the commission. While alone in the counsel room Irwin sat quietly reading papers, he being able to observe through the iron bars of the door what was going on in the corridors. When the approach of the commission to the room was observed by Irwin, and as one of the prison keepers was about to insert his key in the lock, Irwin pushed a heavy oak table against the door, which opened inward, and attempted by throwing his weight against the table to prevent the entrance into the counsel room of the commission, the district attorney, Irwin's counsel, the stenographer, the warden and witnesses. It required considerable force to push the table back from the door to allow the ingress of the interested parties. As the door was pushed open and Irwin found further resistance futile, he picked up a chair as though to strike an approaching keeper. He was overpowered in the presence of the commission, though with no greater force than necessary for

the purpose. He then appeared to be in a state of considerable excitement, so that Warden Adams of the Tombs was instructed by the commission to have Irwin taken back to his cell. Thereupon he became quiet and created no further disturbance, and his life in the Tombs since that time has been that of the average prisoner, though it is said that he has shown a disinclination to associate during the exercise periods with the other inmates of the jail.

It is the opinion of the commission that Irwin on that particular occasion referred to above, purposely and knowingly refused to talk to the commission and created the scene described. It seems to the commission at least probable that Irwin's scuffle in the counsel room was for the purpose of evading examination by the commission. It may be, of course, that Irwin will create similar scenes on other occasions. While Irwin has been irascible and impulsive at times, there has always been some understandable cause or provocation, though usually too slight to justify the burst of temper or use of force displayed on the occasion. In other words, the difficulty has been more a lack of self-control on Irwin's part than one of irrational reaction to circumstances which might have caused slight irritation in a normal person.

The case of *People* v. *Carpenter* (102 N. Y. 238) is pertinent here. The defendant had killed his wife by stabbing her on the street, in broad daylight, and in the presence of a number of persons. The defense introduced evidence of insanity and requested the court to charge the jury that the defendant was not responsible " if some controlling disease was in truth the acting power within him [the prisoner] which he could not resist, or if he had not sufficient use of his reason to control the passion which prompted the act."

The court refused the request to charge, and the Court of Appeals held that such refusal was not error. " The principle of this request," said Chief Judge RUGER, " is not only impliedly condemned by sections 21 and 23 of the Penal Code (now sections 1120 and 34, Penal Law), but has been held to be untenable by the express decision of this court." (Citing *Flanagan* v. *People*, 52 N. Y. 465.)

The prison records show, it should be noted, that Irwin has been visited frequently by counsel, and it may be mentioned here that his counsel was present throughout the scene of disorder in the counsel room of the Tombs, but by no word nor act sought to calm Irwin or to persuade him to allow the commission, in the performance of its duties, to question him and consider his answers as bearing upon his mental condition.

The fact that in reaching its conclusions the commission has not been able to interrogate Irwin should be noted in passing. The first effort made in the counsel room of the Tombs Prison has already been described. On a later occasion, on or about the 27th day of October, 1937, when the commission was taking the testimony in the Tombs, the commission went to Irwin's cell, a representative of the district attorney, Irwin's counsel, the stenographer and Warden Adams accompanying. Irwin was visible in his cell through the bars of the door. The chairman of the commission, standing at the barred door, stated in a voice so loud that Irwin could not fail to hear it that the commission had come to interrogate him and to take his testimony, that the commission entertained no prejudice for or against Irwin, but was engaged in the performance of duties under an order of court. Irwin remained silent.

On a further occasion, on or about the 9th day of February, 1938, the commission again went to Irwin's cell and announced to him that it desired to interrogate him in the performance of its duties. Again he remained mute.

On both of these occasions the commission was accompanied by Irwin's counsel, but on neither did counsel request Irwin's co-operation with the commission, despite evidence tending to show that Irwin has great confidence in his counsel. That Irwin is capable of understanding the proceeding and of making his defense is not doubted by the commission.

In this connection it may be observed that Irwin frequently stated to his prison keepers that he was averse to appearing and would never appear before and answer the questions of a lunacy commission. Irwin explained that what he wanted was a trial by a jury; that he was opposed to a lunacy commission. It is significant that this attitude of Irwin's toward the lunacy commission reflects precisely that of Irwin's counsel, who opposed the appointment of a lunacy commission, preferring to go before a trial jury without inviting an examination and report by a commission concerning the sanity of his client.

Nor during any of the visits to the Tombs Prison of Irwin's counsel, and his conferences with counsel in the counsel room, which occurred from time to time, according to the evidence, does it appear that there was the slightest disturbance or disorder.

In consideration of the issues before it, the commission has not deemed it to be within its province to consider whether it is probable or improbable that a trial jury will find Irwin guilty of the crimes for which he has been indicted. The principal issue before the commission is not whether, in common parlance, Irwin is crazy or sane. It is whether he is responsible for the crimes with which

he is charged, so far as the defense of insanity is concerned, under the definition of what constitutes irresponsibility for crime under the New York Penal Law.

Upon this issue the commission reports an opinion, believed to be sustained by a clear preponderance of evidence. Upon the issues considered, it has not been suggested that the commission must require proof of sanity or insanity beyond a reasonable doubt.

Furthermore, while the record is voluminous and much testimony has been taken and many exhibits allowed in evidence, the commission has confined itself, in reaching the opinion now reported to the court, to a consideration of such evidence as is relevant and material under the rules of evidence as understood and applied by the commission.

To recapitulate: After careful examination and consideration of the material and relevant testimony and such personal observation of the defendant as there was opportunity to make, the undersigned are of the opinion that the said defendant was not in such a state of idiocy, imbecility, lunacy or insanity as not to know the nature and quality of the acts for which he has been indicted and not to know that the acts were wrong; that he is not in such a state of idiocy, imbecility, lunacy or insanity as to be incapable of understanding the proceedings or making his defense.

Dated NEW YORK, *March* 24, 1938.

Respectfully submitted.

ARCHIBALD R. WATSON, *Chairman.*
ISRAEL S. WECHSLER, M. D.
CHARLES D. RYAN, M. D.
*Commissioners in Lunacy.*

The foregoing report is hereby approved. (*Brotherton* v. *People,* 75 N. Y. 162.)

JOHN J. FRESCHI, *Judge.*
*Court of General Sessions.*